WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christian Dale Lowery, | No. CV 12-1625-PHX-SMM (MEA) |
| Plaintiff, | |
| v. | **O R D E R** |
| Dr. Barcklay, | |
| Defendant. | |

Plaintiff Christian Dale Lowery, who is currently confined in the Arizona State Prison Complex-San Luis, brought this civil rights case pursuant to 42 U.S.C. § 1983. (Doc. 1).  Plaintiff moves for summary judgment (Doc. 73) and Defendant cross-moves for summary judgment (Doc. 82).[1]

**I.     Background**

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a claim and directed Defendant Barcklay to answer Plaintiff's Eighth Amendment deliberate indifference to medical needs claim in Count One.  (Doc. 3).  The Court dismissed the remaining claims and Defendants.  (*Id.*).  Plaintiff and Defendant cross-move for summary judgment as to Count One.

. . . .

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) regarding the requirements of a response.  (Doc. 86).

1 | **II.    Summary Judgment Standard**

2    A court must grant summary judgment "if the movant shows that there is no

3 genuine dispute as to any material fact and the movant is entitled to judgment as a matter

4 of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

5 (1986). The movant bears the initial responsibility of presenting the basis for its motion

6 and identifying those portions of the record, together with affidavits, if any, that it

7 believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at

8 323.

9    If the movant fails to carry its initial burden of production, the nonmovant need

10 not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d

11 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the

12 burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that

13 the fact in contention is material, i.e., a fact that might affect the outcome of the suit

14 under the governing law, and that the dispute is genuine, i.e., the evidence is such that a

15 reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*,

16 *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d

17 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact

18 conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-

19 89 (1968); however, it must "come forward with specific facts showing that there is a

20 genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475

21 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

22    At summary judgment, the judge's function is not to weigh the evidence and

23 determine the truth but to determine whether there is a genuine issue for trial. *Anderson*,

24 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and

25 draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only

26 the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P.

27 56(c)(3).

28 . . . .

1   **III.    Facts**

2          On March 14, 2011, Plaintiff sustained an injury to his left hand while on work

3   detail as a plumber at the Arizona State Prison Complex ("ASPC")-Yuma, Cheyenne

4   Unit.  (Doc. 74 ¶ 1; Doc. 83 ¶ 1).  The same day, Plaintiff was brought to medical on an

5   emergency basis by security staff.  (Doc. 83 ¶ 31; Doc. 91 ¶ 31).  Plaintiff was seen by a

6   nurse and Dr. Milazzo, whose notes indicate that Plaintiff had a 1/2-3/4 inch laceration on

7   the dorsal aspect of his left hand over the distal third metacarpal, i.e. a cut over the

8   knuckle of his middle finger of his left hand.  (Doc. 83 ¶ 32; Doc. 91 ¶ 32).  Plaintiff

9   explained to medical staff that he cut his hand on a piece of metal while working on a

10  drinking fountain.  (Doc. 83 ¶ 33; Doc. 91 ¶ 33).  At that time, Plaintiff could fully flex

11  and extend his finger.  (Doc. 83 ¶ 34; Doc. 91 ¶ 34).

12         Plaintiff was given three stiches, antibiotic ointment, and sterile dressing; was

13  instructed on how to treat the injury and to report if there was any drainage or swelling;

14  was prescribed an antibiotic; and was given a Special Needs Order ("SNO") for limited

15  duty.  (Doc. 83 ¶ 35; Doc. 91 ¶ 35).  Plaintiff was scheduled to have the stitches removed

16  in ten days and was told to follow-up with the Cheyenne Unit provider if he had any

17  problems.  (Doc. 83 ¶ 36; Doc. 91 ¶ 36).  Dr. Milazzo's observation that Plaintiff had full

18  flexion and extension of his finger at the time of the initial observation indicates that, at

19  that time, all of Plaintiff's tendons were intact.  (Doc. 83 ¶ 38; Doc. 91 ¶ 38).

20         On March 21, 2011, Plaintiff submitted a Health Needs Request ("HNR") stating

21  that he had injured his hand on March 14, 2011, and that he was concerned his hand

22  might be fractured.  (Doc. 83 ¶ 39; Doc. 91 ¶ 39).  Plaintiff requested to see a provider to

23  have his hand x-rayed.  (Doc. 83 ¶ 39; Doc. 91 ¶ 39).  Plaintiff was seen by the nursing

24  staff the same day.  (Doc. 83 ¶ 40; Doc. 91 ¶ 40).  The nurse noted that Plaintiff's left

25  hand was swollen; he reported that since receiving stitches, his hand would swell and

26  then the swelling would recede; Plaintiff's stitches were still intact; and there was no

27  redness or drainage.  (Doc. 83-1 at 18).  The nurse scheduled Plaintiff to see a provider.

28  (Doc. 83 ¶ 40; Doc. 91 ¶ 40).

1    On March 22, 2011, Defendant Dr. Barcklay saw Plaintiff and Plaintiff told her

2   that he was taking an antibiotic, he did not have an infection, and he thought his hand

3   might be fractured.   (Doc. 83 ¶ 43; Doc. 91 ¶ 43).   Defendant Barcklay examined

4   Plaintiff and noted that he had no signs of infection, his laceration was well-healed, and

5   his stitches were intact.  (Doc. 83 ¶ 43; Doc. 91 ¶ 43).  Plaintiff's hand showed swelling

6   with a slight depression over his third metacarpal joint and that he was unable to fully

7   extend his left, third finger.  (Doc. 83 ¶ 45; Doc. 91 ¶ 45).

8    Defendant Barcklay asserts that Plaintiff made no mention of re-injuring his hand

9   at the March 22, 2011 appointment.   (Doc. 83 ¶¶ 44, 46).   Plaintiff asserts that, at the

10  March 22, 2011 appointment, he told Defendant Barcklay that he had re-injured his hand

11  twice while performing limited duties at work and told her that he was in "substantial

12  pain" and that his middle finger would not straighten all the way.  (Doc. 91 ¶ 44; Doc. 89

13  ¶ 4).  Plaintiff asserts that Defendant Barcklay gave him a bottle of 24 200mg ibuprofen

14  tablets for pain.  (Doc. 89 ¶ 4).

15   Although Defendant Barcklay suspected that Plaintiff may have a tendon injury as

16  opposed to a fracture, she ordered an x-ray to rule out a fracture to determine whether she

17  was proceeding with the correct course of treatment.  (Doc. 83 ¶¶ 47, 48; Doc. 91 ¶¶ 47,

18  48).  Defendant Barcklay's plan was to have Plaintiff finish his antibiotics, to obtain the

19  x-ray to rule out a fracture, and for Plaintiff to take ibuprofen for pain.  (Doc. 83 ¶¶ 49,

20  50; Doc. 91 ¶¶ 49, 50).

21   On March 24, 2011, Plaintiff was seen by nursing staff to have his stitches

22  removed and was given bandages and instructed to keep the area clean and covered.

23  (Doc. 83 ¶ 56; Doc. 91 ¶ 56).  At that time, the nurse recorded that Plaintiff told her "he

24  feels like he has more movement in his fingers already."  (Doc. 83-1 at 18).  On March

25  27, 2011, Plaintiff submitted an HNR requesting the status of his x-ray; the nursing staff

26  responded to the HNR and advised Plaintiff that his x-ray was scheduled for March 28,

27  2011.  (Doc. 83 ¶ 58; Doc. 91 ¶ 58).  Plaintiff's left hand was x-rayed on March 28, 2011.

28  (Doc. 83 ¶ 59; Doc. 91 ¶ 59).

1        On March 31, 2011, Plaintiff submitted an HNR stating that he was treated for an

2  injury to his hand on March 14, 2011 and that he was still having problems with pain,

3  swelling, and his finger not moving "as it should." (Doc. 83-1 at 21). On April 7, 2011,

4  Plaintiff was seen on the nursing line and the nurse recorded that Plaintiff stated that the

5  swelling in his hand had reduced and he was having trouble moving his hand the right

6  way; the nurse further recorded that Plaintiff had no swelling and Plaintiff denied pain or

7  discomfort when assessed, and noted that the plan was for Plaintiff to follow-up with the

8  provider when the results of his x-ray were available. (Doc. 83 ¶¶ 62-63; Doc. 91 ¶¶ 62-

9  63).

10        On April 8, 2011, Plaintiff submitted an HNR stating that he still needed to see a

11  provider regarding his hand "which was injured on 3-14-11" because it was "still

12  swollen," "still hurts," and the finger "still will not move right." (Doc. 83-1 at 23). On

13  April 9, 2011, nursing staff referred the HNR to a provider and Defendant Barcklay

14  responded that she was still waiting to get the x-ray report and could not take Plaintiff's

15  word for a diagnosis. (*Id.*). On April 15, 2011, Defendant Barcklay received the x-ray

16  results, which showed that Plaintiff had an old fracture, but not recent fractures. (Doc. 83

17  ¶ 67; Doc. 91 ¶ 67). Because a fracture was ruled out and Plaintiff was still having

18  trouble moving his finger, Defendant Barcklay submitted an outside consult request to

19  the Medical Review Committee for a consultation with an orthopedist based on the

20  possibility that Plaintiff had a tendon laceration. (Doc. 83 ¶ 68; Doc. 91 ¶ 68).

21        On April 18, 2011, Plaintiff submitted an HNR complaining of pain, swelling, and

22  lack of movement in his finger. (Doc. 74-1 at 44).[2] Plaintiff was seen by nursing staff on

23  April 18, 2011 due to a re-injury of his hand and he complained of decreased range of

24  motion and increased pain. (Doc. 83 ¶ 73; Doc. 91 ¶ 73). The nurse observed increased

25  edema or scarring at Plaintiff's knuckle, decreased passive range of motion, increased

26  active range of motion without pain, and recommended ibuprofen, and ice for twenty-

27

28        [2] The copy of this HNR submitted to the Court is low quality and illegible in places. (Doc. 74-1 at 44).

1    four hours, and an SNO for light duty.  (Doc. 83 ¶¶ 73-74; Doc. 91 ¶¶ 73-74).  Defendant

2    Barcklay signed off on the nurse's treatment plan.  (Doc. 83 ¶ 74; Doc. 91 ¶ 74).

3         Defendant Barcklay's request for an orthopedic consultation was approved and, on

4    April 29, 2011, a telemedicine appointment was scheduled for May 5, 2011.  (Doc. 83 ¶

5    69; Doc. 91 ¶ 69).  Plaintiff had a telemedicine conference with an orthopedic doctor on

6    May 5, 2011, and the doctor noted that Plaintiff lacked about twenty to thirty degrees

7    extension of his metacarpophalangeal joint and that his other fingers were fine, and

8    diagnosed Plaintiff with chronic extensor tendon laceration of his third digit left hand.

9    (Doc. 83 ¶ 77, Doc. 91 ¶ 77).  After discussing the option of attempting surgical repair or

10   leaving the hand as is, it was decided to attempt repair.  (*Id.*).  On May 13, 2011,

11   Defendant Barcklay reviewed the orthopedist's report and submitted a request for

12   Plaintiff to have surgery to repair his tendon.  (Doc. 83 at ¶¶ 78-79; Doc. 91 ¶¶ 78-79).

13   On May 26, 2011, Plaintiff was sent to Tempe St. Luke's Hospital; and was seen by Dr.

14   Faibisoff[3] on May 28, 2011, who noted that Plaintiff lacked about fifteen to twenty

15   degrees of full extension in his middle finger, that Plaintiff's injury was acute, and that

16   Plaintiff should be brought in on an elective basis because it was a holiday weekend and

17   there were not staff available for non-chronic cases.  (Doc. 83-1 at 30-31).[4]

18        On return to the ADC, Plaintiff was seen by nursing staff, who noted that he

19   would be scheduled for surgery on June 6 or 8, 2011, and that the hospital ordered no

20   treatment except pain medication.  (Doc. 83-1 at 32).  Defendant Barcklay was contacted

21   and approved a prescription of 400 mg ibuprofen as needed for two weeks.  (*Id.*).

---

23   [3] Although the report from this visit indicates that Dr. Vasiq was the
24   "admit/attending physician," the actual report was dictated by Dr. Faibisoff, so it appears
     that Dr. Faibisoff actually saw Plaintiff.

25   [4] Plaintiff objects to the characterization of his injury as acute because he argues
26   that it contradicts the orthopedic doctor's finding at the telemedicine appointment, where
     that doctor diagnosed his condition as chronic.  Plaintiff asserts this was "likely a typing
27   or dictating error."  (Doc. 91 ¶ 80).  There is no evidence in the record that Dr. Faibisoff's
28   opinion was a typing or dictating error, rather than a difference of opinion with the
     orthopedist.

1   Plaintiff asserts that this was not the pain medication recommended by the doctor at the

2   hospital, but provides no evidence as to what pain medication was recommended by the

3   doctor at the hospital.   (Doc. 89 ¶ 12).   From May 29, 2011 through June 5, 2011,

4   Plaintiff was seen by nursing staff several times and continued to receive ibuprofen for

5   his pain.  (Doc. 83 ¶¶ 84-89; Doc. 91 ¶¶ 84-89).

6          On June 6, 2011, Plaintiff was transported to Tempe St. Luke's for his surgery.

7   (Doc. 83 ¶ 90; Doc. 91 ¶ 90).  During the surgery, the surgeon removed a segment of scar

8   tissue, repaired the extensor tendon, and determined that Plaintiff had a good repair.

9   (Doc. 83-1 at 38-39; Doc. 83 at ¶ 91; Doc. 91 ¶ 91).   On June 8, 2011, Plaintiff was

10  returned to ADC custody with his left hand and forearm in a cast.  (Doc. 83 ¶ 92; Doc. 91

11  ¶ 92).   Dr. Sandoval filled out an outside consult request for Plaintiff's post-operative

12  visit and prescribed Tylenol #3 and ibuprofen for seven days as needed.  (*Id.*).   On June

13  10, 2011, Plaintiff was returned to ASPC-Yuma, where a nurse scheduled a follow-up

14  with a provider, prescribed 200 mg over-the-counter ibuprofen, and gave Plaintiff an

15  SNO for no duty and trash bags and tape for his cast for showers.  (Doc. 83 ¶ 95; Doc. 91

16  ¶ 95).  Defendant Barcklay approved the prescription and SNO.  (Doc. 83 ¶ 96; Doc. 91 ¶

17  96).

18         On June 28, 2011, Plaintiff had a post-operative follow-up at Tempe St. Luke's,

19  where his cast was removed and he was placed in a splint with instructions to wear the

20  splint for two weeks, after which he could begin progressive range of motion exercises on

21  his own.  (Doc. 83 ¶ 97; Doc. 91 ¶ 97).  Defendant Barcklay saw Plaintiff on July 20,

22  2011, where he reported that he was doing fine and had a full range of motion and was

23  playing guitar.   (Doc. 83 ¶ 99; Doc. 91 ¶ 99).   Defendant Barcklay observed that

24  Plaintiff's hand was well-healed with minimal swelling and Defendant Barcklay and

25  Plaintiff discussed Plaintiff continuing independent physical therapy exercises and

26  playing guitar.  (Doc. 83 ¶ 99; Doc. 91 ¶¶ 99).

27  . . . .

28  . . . .

1      **IV.    Discussion**

2           Plaintiff alleges that Defendant Barcklay violated his Eighth Amendment rights

3      because she was deliberately indifferent to his serious medical needs.  Plaintiff asserts

4      that Defendant Barcklay was deliberately indifferent to his serious medical needs when

5      she: (1) did not issue an SNO for no work duty or limited work duty at the March 22,

6      2011 appointment; (2) did not recommend that Plaintiff's hand be splinted, which

7      Plaintiff asserts "would have prevented countless re-injuries" that Plaintiff "suffered as

8      [his] tendon tore"; (3) inappropriately waited for the x-ray results before she submitted a

9      request for Plaintiff to see an orthopedic specialist; (4) did not issue an order for ice to

10     help the swelling in Plaintiff's hand; and (5) did not prescribe the pain medication

11     recommended by the doctor at the hospital after Plaintiff's May 28, 2011 appointment,

12     but instead prescribed ibuprofen.

13          Plaintiff further alleges that during the May 5, 2011 telemed appointment, the

14     orthopedic specialist told him that because so much time had lapsed, the chances for a

15     successful surgery were "greatly reduced."   Plaintiff alleges that, as a result of

16     Defendant's actions, he suffered severe pain for three months, his hand's capacity is

17     diminished from that prior to the injury, and the hospitalization and surgery were

18     required.   Plaintiff also contends that he will not be able to work as a "journeyman

19     carpenter (framer)" due to the diminished capacity of his hand and will require vocational

20     rehabilitation.

21          In Response, Defendants argue that Defendant Barcklay was not deliberately

22     indifferent to Plaintiff's serious medical needs and the facts reflect that Defendant

23     Barcklay treated Plaintiff appropriately.

24          Under the Eighth Amendment standard, a prisoner must demonstrate "deliberate

25     indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.

26     2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the

27     deliberate-indifference analysis: an objective standard and a subjective standard.  First, a

28     prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted).

1     A "'serious' medical need exists if the failure to treat a prisoner's condition could result

2     in further significant injury or the 'unnecessary and wanton infliction of pain.'"

3     *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by*

4     *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal

5     citation omitted).  Examples of indications that a prisoner has a serious medical need

6     include "[t]he existence of an injury that a reasonable doctor or patient would find

7     important and worthy of comment or treatment; the presence of a medical condition that

8     significantly affects an individual's daily activities; or the existence of chronic and

9     substantial pain." *McGuckin*, 974 F.2d at 1059-60.

10     Second, a prisoner must show that the defendant's response to that need was

11     deliberately indifferent.  *Jett*, 439 F.3d at 1096.  "Prison officials are deliberately

12     indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally

13     interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002)

14     (internal citations and quotation marks omitted).  Deliberate indifference may also be

15     shown by the way in which prison officials provide medical care, *Hutchinson v. United*

16     *States*, 838 F.2d 390, 394 (9th Cir. 1988), or "by circumstantial evidence when the facts

17     are sufficient to demonstrate that a defendant actually knew of a risk of harm." *Lolli v.*

18     *County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003).  And deliberate indifference may

19     be shown by a purposeful act or failure to respond to a prisoner's pain or possible

20     medical need. *Jett*, 439 F.3d at 1096.  But the deliberate-indifference doctrine is limited;

21     an inadvertent failure to provide adequate medical care or negligence in diagnosing or

22     treating a medical condition does not support an Eighth Amendment claim. *Wilhelm v.*

23     *Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted).  Further, a mere

24     difference in medical opinion does not establish deliberate indifference. *Jackson v.*

25     *McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

26     Finally, even if deliberate indifference is shown, to support an Eighth Amendment

27     claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at

28     1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing

1    medical treatment does not constitute Eighth Amendment violation unless delay was

2    harmful).

3           Here, the fact that Plaintiff had a serious medical need is not in dispute.  Rather,

4    the parties disagree about whether Defendant Barcklay's actions demonstrate deliberate

5    indifference to Plaintiff's serious medical needs.

6           Plaintiff's conclusions that Defendant Barcklay should have issued him an SNO

7    for no work duty or limited work duty at the March 22, 2011 appointment, should have

8    recommended that his hand be splinted, should have immediately ordered him to see an

9    orthopedic specialist, should have ordered ice for Plaintiff's hand, and erred when she

10   prescribed him ibuprofen over another unspecified pain medication are speculative and

11   are unsupported by the record in this case.  Plaintiff personally opines that the treatment

12   he describes would have helped his hand heal, would have prevented him from suffering

13   pain, or would have prevented him from having to have surgery, but these personal

14   opinions are not supported by any medical evidence, expert opinion, and the bases for

15   these opinions are unexplained.  Likewise, Plaintiff's contentions that his chances for a

16   successful surgery were delayed, that his hand's capacity is now diminished, and that he

17   requires vocational rehabilitation are again unsupported by any evidence except for

18   Plaintiff's opinions.  These conclusions do not demonstrate that Defendant Barcklay was

19   deliberately indifferent to Plaintiff's serious medical needs.  *See Toguchi v. Chung*, 391

20   F.3d 1051, 1059 (9th Cir. 2004) (where conclusion that doctor's treatment was

21   insufficient is merely speculative, such speculation does not support a claim that doctor

22   was deliberately indifferent to serious medical needs).  Indeed, even if Plaintiff could

23   present some evidence to support his conclusions, it would merely establish a difference

24   in opinion regarding the best course of treatment, not deliberate indifference.  *See*

25   *Jackson*, 90 F. 3d at 332.

26          Moreover, Plaintiff does not allege that he requested that his hand be splinted, that

27   he be issued an SNO for no or limited work duty, that he requested ice, or that he

28   requested better pain medication.  Rather, Plaintiff alleges that Defendant Barcklay

1   should have assumed that Plaintiff needed these things based on her assessment of his

2   hand.  As discussed above, there is no evidence in the record that Plaintiff did need these

3   things for the treatment of his serious medical need.  As such, the Plaintiff's medical

4   records and treatment are devoid of any evidence of deliberate indifference by Defendant

5   Barcklay.  *See Toguchi*, 391 F.3d at 1059 ("there must be a conscious disregard of a

6   serious risk of harm for deliberate indifference to exist.").  What the record in this case

7   establishes, however, is that Defendant Barcklay provided proper medical care to

8   Plaintiff.  She consistently saw Plaintiff in response to HNRs, followed up on tests,

9   prescribed ibuprofen for his pain, recommended that he been seen by an orthopedic

10  specialist, submitted a request for Plaintiff to have surgery as recommended by the

11  specialist, and followed up with Plaintiff after the surgery.  Aside from his own opinions

12  that Defendant Barcklay could have provided him with better treatment, Plaintiff offers

13  no evidence establishing that Defendant Barcklay knew of and disregarded an excessive

14  risk to Plaintiff's health such that she violated Plaintiff's Eighth Amendment rights.

15          Accordingly, the Court will deny Plaintiff's Motion for Summary Judgment and

16  grant Defendants' Cross-Motion for Summary Judgment.[5]

17  **IT IS ORDERED:**

18          (1)     The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion

19  for Summary Judgment (Doc. 73) and Defendant's Cross-Motion for Summary Judgment

20  (Doc. 82).

21          (2)     Plaintiff's Motion for Summary Judgment (Doc. 73) is **denied**.

22  . . . .

23  . . . .

24  . . . .

25

26  ———————————

27          [5] Because the Court finds that the undisputed facts establish that Defendant
    Barcklay did not violate Plaintiff's Eighth Amendment rights, the Court will not discuss
28  Defendant's other arguments regarding qualified immunity, punitive damages, and the
    Eleventh Amendment.

1    (3)  Defendant's Cross-Motion for Summary Judgment (Doc. 82) is **granted**,

2 and the action is terminated with prejudice.  The Clerk of Court must enter judgment

3 accordingly.

4    DATED this 28th day of April, 2015.

5

6

7                  Honorable Stephen M. McNamee

8                  Senior United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28